Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 19, 2007        Decided December 11, 2007

No. 06-1164

ENVIRONMENTAL DEFENSE, INC., ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND
STEPHEN L. JOHNSON, ADMINISTRATOR,
RESPONDENTS

On Petition for Review of an Order of the
Environmental Protection Agency

*Robert E. Yuhnke* argued the cause for petitioners. With him on the briefs was *Joanne M. Spalding*.

*David J. Kaplan*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief was *John C. Cruden*, Deputy Assistant Attorney General.

Before: GINSBURG, *Chief Judge*, and ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Environmental Defense, Inc., the Natural Resources Defense Council, and the Sierra Club petition for review of a final rule promulgated by the Environmental Protection Agency to regulate "hot spot" analyses undertaken as part of the transportation conformity determinations required by the Clean Air Act ("CAA"). *See* PM$_{2.5}$ and PM$_{10}$ Hot Spot Analyses in Project-Level Transportation Conformity Determinations for the New PM$_{2.5}$ and Existing PM$_{10}$ National Ambient Air Quality Standards ("Final Rule"), 71 Fed. Reg. 12,468, 12,470-74 (Mar. 10, 2006) (to be codified at 40 C.F.R. pt. 93). Petitioners seek a remand of sections 93.116 and 123(b) of the Final Rule on the ground that they fail to implement the conformity conditions in CAA §§ 176(c)(1)(A) and (B)(iii). Petitioners also seek vacatur of EPA's decision to withdraw a previously announced emissions model from use in "hot spot" analyses on the ground that EPA failed to give prior adequate notice or opportunity for comment.[1] We grant the petition in part and deny it in part. Because petitioners fail to show that EPA's interpretation of CAA § 176(c)(1)(A) is unreasonable or that EPA failed to give adequate notice and opportunity for comment prior to withdrawing the model, we deny the petition as to those contentions. However, if "any area" properly means "a local area" under CAA § 176(c)(1)(B)(i) and (B)(ii), then it is arbitrary and capricious not to define the term similarly in (B)(iii) or not to explain why the term there means something different. We therefore grant the petition and remand the Final Rule for EPA either to interpret (B)(iii) in harmony with (B)(i) and (B)(ii) or to explain why it need not do so.

---

[1] The court severed Petitioners' other challenges to the Final Rule pursuant to a joint motion of the parties in light of settlement discussions. *Envtl. Def. v. EPA*, No. 06-1164 (D.C. Cir. June 14, 2007).

**I.**

Pursuant to the CAA, EPA has established National Ambient Air Quality Standards ("NAAQS") that regulate air contaminants, including particulate matter measuring less than ten micrometers ("$PM_{10}$") and less than 2.5 micrometers ("$PM_{2.5}$"). The states, in turn, have prepared State Implementation Plans ("SIPs") to "provide[] for implementation, maintenance, and enforcement of [NAAQS] in each air quality control region (or portion thereof) . . . ." CAA § 110(a)(1), 42 U.S.C. § 7410(a)(1). *See generally Envtl. Def. Fund v. EPA* ("*EDF II*")*,* 167 F.3d 641, 643-46 (D.C. Cir. 1999); *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 886-87 (D.C. Cir. 2006). The CAA requires that states be divided into specific areas, which are rated "nonattainment" if air quality standards do not comply with the NAAQS, "attainment" if they do, or "maintenance" if they have passed from nonattainment to attainment status. CAA §§ 107(d)(1)(A)(I)-(ii); 3(E), 42 U.S.C. §§ 7407(d)(1)(A)(I)-(ii); (3)(E).

The federal conformity rule, first adopted in 1977, prohibited federal agencies from assisting, supporting, or approving transportation activities that do not conform to a state's SIP. *See* Criteria and Procedures for Determining Conformity to State or Federal Implementation Plans, 58 Fed. Reg. 62,188, 62,189 (Nov. 24, 1993). State-designated metropolitan planning organizations ("MPOs") for certain urban areas, as required by the federal highway law,[2] could not approve

---

[2] Thus, states must designate an MPO in each urban area with a population over 50,000 persons. 23 U.S.C. § 134(d). The MPO, in turn, must prepare a 20-year regional transportation plan, *id*. at § 134(I), and a transportation improvement program ("TIP") with a four-year horizon. *Id*. at § 134(j). These "plans" and "programs"

transportation activities that did not conform to a SIP. *Id.* In the years after adoption of the conformity rule, EPA and the U.S. Department of Transportation ("DOT") engaged in inconclusive discussions about whether individual transportation projects that were part of broader transportation plans implementing SIP requirements could be approved without further assessments. EPA argued for additional assessments to evaluate whether individual projects would affect the attainment of NAAQS in SIP areas. *See, e.g.*, Letter from Jennifer Joy Wilson, Assistant Adm'r for External Affairs, EPA & Don R. Clay, Acting Assistant Adm'r for Air and Radiation, EPA, to Robert E. Farris, Administrator, Federal Highway Administration, DOT (Nov. 8, 1988).

In 1990, Congress amended the CAA's conformity provisions, requiring EPA and DOT jointly to promulgate transportation regulations. As amended, Section 176(c)(1)[3] sets forth conformity requirements for all activities:

---

identify transportation "projects" that the MPO wants to implement. *See generally* 23 U.S.C. §§ 101 *et seq.*; 49 U.S.C. §§ 5301 *et seq.*

> [3] Section 176(c)(1) provides, in part, that:
>
>> No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title [addressing SIPs].

42 U.S.C. § 7506(c)(1). MPOs similarly may not approve any "project, program, or plan which does not conform to a [SIP]." *Id.*

Conformity to an implementation plan means–

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not –
(i)  cause or contribute to any new violation of any standard *in any area*;
(ii)  increase the frequency or severity of any existing violation of any standard *in any area*; or
(iii)  delay timely attainment of any standard or any required interim emission reductions or other milestones *in any area*.

42 U.S.C. § 7506(c)(1) (emphases added).

The EPA first invoked its authority under § 176(c)(4), 42 U.S.C. § 7506(c)(4), to promulgate regulations applicable to transportation projects, in 1993.  In relevant part, those regulations required federal agencies and MPOs to conduct an analysis of the impact of a transportation project upon carbon monoxide and $PM_{10}$ pollution at the local level in nonattainment and maintenance areas.  *See* 40 C.F.R. § 93.101 (1993).  Such an analysis thus provides information concerning pollutant levels "on a scale smaller than the entire nonattainment or maintenance area, including, for example, congested roadway intersections . . . ."  *Id*.  The rule required only a qualitative approach for $PM_{10}$ "until EPA releases [quantitative] modeling guidance on this subject and announces in the Federal Register that these requirements are in effect."  *Id*. §§ 93.131(d), 51.454(d) (1993); *see also id*. § 93.123(b)(4).

In November 2003 EPA proposed to amend these conformity regulations by adopting criteria and procedures for $PM_{2.5}$ and revising the hot spot rule for $PM_{10}$. Notice of Proposed Rulemaking ("NPRM"), 68 Fed. Reg. 62,690, 62, 712 (Nov. 5, 2003). On December 13, 2004, EPA issued a supplementary proposal setting forth a number of hot spot options for $PM_{2.5}$. Supplemental Notice of Proposed Rulemaking ("Supplemental NPRM"), 69 Fed. Reg. 72,140, 72,144-45 (Dec. 13, 2004), and for $PM_{10}$, *id*. at 72,149-50. EPA proposed to require only a qualitative analysis for $PM_{2.5}$ in the first instance, as it had done for $PM_{10}$. *Id*. at 72,145.

Ultimately EPA revised the existing hot spot regulation as regards $PM_{10}$ and imposed the same criteria for $PM_{2.5}$. Final Rule, 71 Fed. Reg. at 12,470-71 (amending 40 C.F.R. § 93.116). The new hot spot regulation, which applies in nonattainment and maintenance areas regardless of the SIP, 40 C.F.R. § 93.116, now provides that a new transportation project:

> must not [1] cause or contribute to any new localized CO, $PM_{10}$, and/or $PM_{2.5}$ violations or [2] increase the frequency or severity of any existing CO, $PM_{10}$, and/or $PM_{2.5}$ violations in CO, $PM_{10}$ and $PM_{2.5}$ nonattainment and maintenance areas. This criterion is satisfied . . . if it is demonstrated that . . . no new local violations will be created and the severity or number of existing violations will not be increased as a result of the project.

Final Rule, 71 Fed. Reg. at 12,510 (codified at 40 C.F.R. § 93.116(a)).

During the rulemaking, Petitioners commented that proposed § 93.116(a) violated CAA §§ 176(c)(1)(A) and (B)(iii). They posited that by including only two of the four statutory

conformity conditions, the proposed rule failed to require any finding that the project be consistent with the SIP's aim of eliminating all emissions violations and that the project's emissions not delay timely attainment and interim progress in meeting emission milestones. EPA, in response, rejected the view that the "hot spot" regulation supplants existing transportation conformity regulations, maintaining instead that the latter already require transportation projects to be "consistent with the emissions projections and control measures in the SIP." Final Rule, 71 Fed. Reg. at 12,482. According to EPA, the purpose of "hot spot" regulations is limited to preventing an increase in the severity or frequency of local violations of emissions standards, reflecting the mandate of CAA §§ 176(c)(1)(B)(i) and B(iii); EPA rejected a construction of CAA §§ 176(c)(1)(A) and (B)(iii) that would require new individual projects to reduce emissions as opposed to preventing any new violations or worsening of existing violations. *See id.*

EPA also announced in the Final Rule that a previously established quantitative emissions model, MOBILE6.2, while potentially appropriate for quantitative analyses of $PM_{2.5}$ at the regional level, was not appropriate for $PM_{2.5}$ or $PM_{10}$ hot-spot analyses. *Id*. at 12,500. Previously, EPA had stated that MOBILE6.2 "must be used in all $PM_{2.5}$ conformity analyses, until [it is] replaced by newer approved methods or models." Notice of Availability ("NOA"), 69 Fed. Reg. 28,830, 28,832 (May 19, 2004). Upon releasing MOBILE6.2, EPA had explained that the release did not trigger any requirement quantitatively to analyze $PM_{10}$ emissions under the hot spot rule. *Id*.

**II.**

Petitioners challenge EPA's amendment to the "hot spot" conformity regulation, 40 C.F.R. § 93.116, contending that it

unlawfully ignores the requirements of CAA §§ 176(c)(1)(A) and (B)(iii). Petitioners also challenge EPA's withdrawal of MOBILE6.2 for $PM_{2.5}$ hot spot analyses.

**A.**

As a threshold matter, we hold that insofar as EPA maintains that Petitioners' challenge to the Final Rule is time barred because EPA did not reopen these issues in the rulemaking, its position is untenable. The final rule applied existing regulatory criteria to $PM_{10}$ and $PM_{2.5}$, and there is a limited period of time within which an aggrieved party may obtain judicial review of an EPA rule. In the instant case, however, the notices in the Federal Register in November 2003 and December 2004 "create[d] the opportunity for renewed comment [on] and objection" to the "hot spot" regulation as applied to $PM_{2.5}$ and $PM_{10}$. *See Ohio v. EPA*, 838 F.2d 1325, 1328 (D.C. Cir. 1988). The NPRM "invite[d] commenters [(sic)] to suggest additional options" for $PM_{10}$ rules beyond those EPA proposed. 68 Fed. Reg. at 62,713; *see id.* at 62,714. The Supplemental NPRM sought comment on the application of Section 176(c)(1) to $PM_{2.5}$, stating that "EPA believes it is important to consider the full range of options for addressing localized $PM_{2.5}$ concentrations which may cause or contribute to any new violation of the $PM_{2.5}$ standard; increase the frequency or severity of any existing violation; or delay timely attainment of the standard." 69 Fed. Reg. at 72,146.

EPA's proposed rulemaking, which discussed five different options, thus explicitly invited comment on the 1993 conformity rule and the statutory conformity requirements for projects. Given its expansive call for comments on the "hot spot" requirements, EPA cannot plausibly contend that Petitioners' comments asking that the proposed rule be modified for $PM_{2.5}$ and $PM_{10}$ raised issues outside the scope of the rulemaking. Nor did EPA take that position in responding to Petitioners'

comments during the rulemaking. Accordingly, the court may entertain the petition.

## B.

When incorporating $PM_{2.5}$ into the hot spot regulations, EPA did not require that new projects contribute to reducing the severity and number of local NAAQS violations, as Petitioners contend CAA § 176(c)(1)(A) requires, and also did not require that the new projects not delay the timely attainment of emissions standards or milestones in any local area, as Petitioners contend CAA § 176(c)(1)(B)(iii) requires. These additional statutory conditions are important, Petitioners observe, because "they add the requirement that the project must contribute to NAAQS compliance by reducing or eliminating violations, or that measures must be adopted to ensure that emissions from the project will not interfere with attainment by delaying the emission reductions needed for attainment beyond the attainment deadline." Petr.'s Br. 20. The two conditions in the Final Rule "only go so far as to prevent projects that will worsen existing air quality, either by causing new violations where none currently exist or by contributing to the increased frequency or severity of violations being caused by emissions from an existing highway, terminal or other transportation facility." *Id*. at 20-21. Petitioners further contend that when Congress amended the CAA in 1990 to prescribe conditions it removed any agency discretion to define the essential conditions relevant to making a conformity determination and, consequently, EPA had no authority to waive its statutory duty to prescribe criteria and procedures to be used by DOT when making conformity determinations. *Id*. at 6-10, 23, 33.

EPA does not dispute that it cannot waive the requirements of CAA §§ 176(c)(1)(A) and (B), *see* Final Rule, 71 Fed. Reg. at 12,481; Supplemental NOPR, 69 Fed. Reg. at 72,143, but reiterates its position in the rulemaking that neither provision of

the CAA requires individual projects to reduce emissions, *see* Final Rule, 71 Fed. Reg. at 12,481. As construed by EPA, these provisions "only require air quality to not be worsened by an individual project than what would have otherwise occurred." *Id*. at 12,482.

We review Petitioners' challenge to determine whether EPA's promulgation of the Final Rule was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. *See* CAA § 307(d)(9)(A), 42 U.S.C. § 7607(d)(9)(A); *see also* 5 U.S.C. § 706. Challenges to EPA's interpretation of the CAA are governed by the familiar two-pronged test of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under step one, the court asks "whether Congress has directly spoken to the . . . issue;" if Congress' intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. However, if the court determines that "Congress has not directly addressed the precise question at issue," *id*. at 843, then, under step two, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*.

**1.**

Petitioners contend that CAA § 176(c)(1)(A) adds the additional temporal condition that a project contributes to attaining the NAAQS "as expeditiously as practicable." Petr.'s Br. 21. In support of their interpretation that subsection (A) requires emissions reductions, Petitioners point to *EDF II,* 167 F.3d at 647, where the court stated that "a 'conforming' . . . project is one that will contribute to 'eliminating or reducing the severity and number of violations of the [NAAQS] . . . .'" *Id*. (citing 42 U.S.C. § 7506(c)(1)(A)). We conclude that Petitioners have not shown that subsection (A) applies to "hot spots" or that

EPA's contrary position is arbitrary or capricious or contrary to the statute.

Subsection (A) provides that activities shall "conform[] to an implementation plan's purpose." The statute defines an implementation plan in regional terms by state, not as a localized area. *See* CAA § 107(b), 42 U.S.C. § 7407(b). To the extent that subsection (A), on its face, does not apply to the immediate "area substantially affected by [a] project," *cf.* 40 C.F.R. § 93.101, it is unnecessary to reach the question of what subsection (A) may require by way of emissions reduction. But to the extent that subsection (A) is ambiguous because of the reference in CAA § 176(c)(1)'s introductory clause to "project, program, or plan," Petitioners fail to show that EPA's interpretation is not "a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

EPA interprets the conditions in subsection (A) to be "met if a transportation project is consistent with the emissions projections and control measures in the SIP." Final Rule, 71 Fed. Reg. at 12,482. In the preamble to the Final Rule, EPA explained that "[a]lthough . . . transportation projects need to be consistent with a SIP's purpose of reducing violations, this can be accomplished by simply not increasing violations . . . ." *Id.* (citing *Envtl. Def. Fund v. EPA* ("*EDF I*"), 82 F.3d 451 (D.C. Cir. 1996)).[4] According to EPA, so long as air quality concentrations in the entire SIP area are not worsened as the result of a transportation project, subsection (A) is satisfied. Consistent with subsection (A)'s focus on the SIP as a whole by

---

[4] *EDF I*'s interpretation of CAA § 176(c)(1)(A) was recently reaffirmed by *Environmental Defense v. EPA* ("*EDF III*"), 467 F.3d 1329, 1339 (D.C. Cir. 2006), although it too does not speak to the antecedent question of whether subsection (A) requires a "hot spot" analysis.

contrast with the express attention to "any area" in § 176(c)(1)(B), EPA has never taken the position that subsection (A) applies to a "hot spot." For example, in the Supplemental NPRM, EPA cited subsection (B) as the basis for requiring conformity analysis at PM "hot spots." *See* 69 Fed. Reg. at 72,146.

Petitioners view CAA § 176(c)(2) as the statutory scheme for regional emissions conformity based on the SIP and CAA § 176(c)(1) as the scheme for local "hot spot" conformity based on the NAAQS. Petitioners accordingly assert that EPA has violated the statute because subsection (A) requires something different than subsection (B). But Petitioners presuppose that subsection (A) applies locally without showing that it does. Although Petitioners correctly note that subsection (A) applies to 'any project,' that does not determine whether a project must satisfy the conditions in subsection (A) at the local or the regional level. EPA has taken the latter view, and Petitioners have not established that its interpretation is contrary to the statute or unreasonable.

**2.**

More persuasive is Petitioners' contention that EPA acted arbitrarily and contrary to law by not requiring conformity determinations for individual projects to meet the conditions of CAA § 176(c)(1)(B)(iii) at the local level. CAA § 176(c)(1) defines "conformity" as involving "activities" that occur "in any area" — a phrase that appears in each of subsection (B)'s subparts. EPA includes in the Final Rule the requirements for individual projects to comply with the conditions in (B)(i) and (B)(ii) at the local level, *see* 40 C.F.R. § 93.101, but does not do so for (B)(iii)'s conditions. EPA provides no reason for interpreting "any area" as meaning "a local area," i.e., "hot spots," in (B)(i) and (B)(ii) but not in (B)(iii).

EPA maintains on appeal that the Final Rule, along with the broader regulatory framework and the SIP process can satisfy the requirements of (B)(iii). Because it interprets the statute not to require each project to reduce emissions, EPA asserts that it is not necessary to include (B)(iii)'s conditions in the Final Rule. *See* Final Rule, 71 Fed. Reg. at 12,482. However, under EPA's revision of the "hot spot" regulations, an individual project's emissions could counterbalance mitigation measures already in place, thereby delaying attainment of emissions standards and violating the requirement of (B)(iii) without either increasing or decreasing emissions. EPA's position thus does not seem to cover all circumstances where (B)(iii) is applicable.

Even assuming (B)(iii) is ambiguous, EPA's reliance on the SIP process would appear to be arbitrary and capricious for failure to establish "a rational connection between the facts found and choice made." *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001) (quotations omitted). In the preamble to the Final Rule EPA acknowledged that it "does not anticipate requiring $PM_{2.5}$ SIP modeling to be performed at a level of detail that would identify all potential transportation hot spots" and noted comments by State and Territorial Air Pollution Program Administrators expressing "concerns regarding the ability of the SIP to evaluate the local air quality impacts of all future projects . . . ." Final Rule, 71 Fed. Reg at 12,476. So understood, and in view of the generous time periods associated with the SIP process as outlined in EPA's brief, *see* Resp.'s Br. at 33, it is likely that SIP-based enforcement of (B)(iii)'s conditions would be *post-hoc* and subject to delays. *See, e.g.*, CAA §§ 110(c) & (k)(5), 42 U.S.C. §§ 7410(c) & (k)(5). The statutory prohibition on projects that cause delays in attaining emissions standards would effectively be stripped of almost any impact and be inconsistent with Congress's intent that pollution production be prevented by forward planning. Thus, even were we to treat the text as ambiguous, EPA has failed to create a rational link

between the requirements of (B)(iii) and the regulatory framework or the SIP process.

The fundamental problem, however, is that if, as EPA posits in the Final Rule, "any area" in (B)(i) and (B)(ii) properly means "a local area" under either *Chevron* step one or step two, then it is arbitrary and capricious not to define the term similarly in (B)(iii) or not to provide an explanation that satisfactorily addresses the purpose and function of the condition. EPA's explanation, that individual projects are not required to reduce emissions, does not address this inconsistency. A remand is therefore required for EPA either to interpret (B)(iii) in harmony with (B)(i) and (B)(ii) or to explain why it need not do so.

**3.**

Petitioners also contend that EPA erred procedurally when, without giving adequate notice or soliciting comments, it declined to require that MPOs and federal agencies perform a quantitative analysis of $PM_{2.5}$ emissions at the local level using MOBILE6.2, a previously approved emissions model. Petitioners point to EPA's prior approval of MOBILE6.2 for such analysis in the 2004 NOA. *See* 69 Fed. Reg. at 28,832.

EPA responds that judicial review of this procedural issue is barred because Petitioners did not raise it with "reasonable specificity" in their comments before the agency. *See* CAA § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B). Notwithstanding our ordinarily "strict[]" application of CAA § 307(d)(7)(B), *see Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998), it is inapplicable here. Pursuant to § 307(d)(1)(V), 42 U.S.C. § 7607(d)(1)(V), EPA acted to make CAA § 307(d) applicable to this rulemaking only upon promulgation of the Final Rule. *See* Final Rule, 71 Fed. Reg. at 12,509-10. Petitioners had no prior notice that EPA would take this step; in this circumstance CAA § 307(d)(7)(B) does not require that a

procedural issue first be presented to the agency. *See also Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.,* 117 F.3d 1520, 1535 (9th Cir. 1997).

On the merits, however, Petitioners' contention fails for we find no procedural error. In the Supplemental NPRM, which followed the NOA release of MOBILE6.2, EPA provided sufficient notice and comment opportunities. EPA there specifically "propose[d] to extend the current rule's § 93.123(b)(3) and (b)(4) requirements with respect to $PM_{2.5}$." Supplemental NPRM, 69 Fed. Reg. at 72,145. Section 93.123(b)(4) then provided that "[t]he requirements for quantitative analysis [of $PM_{10}$] will not take effect until EPA releases modeling guidance on this subject and announces in the FEDERAL REGISTER that these requirements are in effect." The Supplemental NPRM also advised that "[i]f EPA finalizes an option that would require quantitative and/or qualitative $PM_{2.5}$ hot spot analyses, we would provide guidance and appropriate models for carrying out such analyses in a timely manner." 69 Fed. Reg. at 72,146. Petitioners objected to this proposed delay in quantitative analysis, noting the previously established availability of MOBILE6.2 and EPA's Technical Guidance on the Use of MOBILE6.2 for Emission Inventory Preparation; other commentators raised similar objections. EPA responded, explaining in the preamble to the Final Rule that, in view of its "technical limitations," MOBILE6.2 was inappropriate for use in performing local analyses because it "will produce inaccurate results in some cases," which EPA described. Final Rule, 71 Fed. Reg. at 12,499; *see also id.* at 12,498-502. This exchange demonstrates that EPA complied with the requirements of notice and comment rulemaking.

Accordingly, we grant the petition in part and remand the Final Rule to EPA either to interpret CAA § 176(c)(1)(B)(iii) in

harmony with (B)(i) and (B)(ii)  or to explain why it need not do so; we otherwise deny the petition.