# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2011          Decided October 28, 2011

No. 10-1105

NATURAL RESOURCES DEFENSE COUNCIL, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

———

On Petition for Review of a Final Rule
of the Environmental Protection Agency

———

*Robert E. Yuhnke* argued the cause for petitioners.  With him on the briefs was *Adriano L. Martinez*.

*David J. Kaplan*, Senior Attorney, U.S. Department of Justice, argued the cause for respondent.  With him on the brief was *John C. Cruden*, Deputy Assistant Attorney General.

Before: GINSBURG,[*] *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

———

[*] As of the date the opinion was published, Judge Ginsburg had taken senior status.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: This case follows up our decision in *Environmental Defense, Inc. v. EPA*, 509 F.3d 553 (D.C. Cir. 2007), in which we reviewed the Environmental Protection Agency's promulgation of a final rule for "PM$_{2.5}$ and PM$_{10}$ Hot Spot Analyses in Project-Level Transportation Conformity Determinations for the New PM$_{2.5}$ and Existing PM$_{10}$ National Ambient Air Quality Standards," 71 Fed. Reg. 12,468 (Mar. 10, 2006) (the "2006 Rule"). The "conformity determinations" referred to in the rule's title are approvals needed under the Clean Air Act ("CAA") for federally funded transportation projects in an area that is designated "nonattainment" or "maintenance" with respect to the National Ambient Air Quality Standards ("NAAQS")— approvals required in order to assure that the project "conforms" to the applicable State Implementation Plan ("SIP"). See *Environmental Defense*, 509 F.3d at 555–58. "Hot spot" analysis means simply analysis of a project's *localized* impact. See 2006 Rule, 71 Fed. Reg. at 12,469/3.

We start with a quick review of the statutory and regulatory provisions at issue in our remand in *Environmental Defense*, explain the nature of that remand, describe the EPA's response to the remand, and (finally) explain the adequacy of that response.

\* \* \*

In 1990 Congress amended the CAA's conformity provisions to provide that

[c]onformity to an implementation plan means—

. . .

(B) that such activities will not—

> (i) cause or contribute to any new violation of any standard *in any area*;
>
> (ii) increase the frequency or severity of any existing violation of any standard *in any area*; or
>
> (iii) delay timely attainment of any standard or any required interim emission reductions or milestones *in any area*.

42 U.S.C. § 7506(c)(1) (emphasis added).

The pertinent passage of the 2006 Rule, however, appeared to disregard subsection (B)(iii). It provided that a new transportation project:

> must not [1] cause or contribute to any new localized CO, $PM_{10}$, and/or $PM_{2.5}$ violations or [2] increase the frequency or severity of any existing CO, $PM_{10}$, and/or $PM_{2.5}$ violations in CO, $PM_{10}$, and $PM_{2.5}$ nonattainment and maintenance areas. This criterion is satisfied . . . if it is demonstrated that . . . no new local violations will be created and the severity or number of existing violations will not be increased as a result of the project.

2006 Rule, 71 Fed. Reg. at 12,510 (codified at 40 C.F.R. § 93.116(a)) (printed here with the same omissions and alterations as printed in *Environmental Defense*, 509 F.3d at 557). Obviously the segments designated [1] and [2] neatly match (B)(i) and (B)(ii), and are paralleled in the sentence beginning "This criterion is satisfied if . . . ." But if the statutory language "any area" required application of the (B)(i) and (B)(ii) requirements at the local level, then the EPA's seeming failure to address B(iii), or to explain its not doing so, was arbitrary and capricious. *Environmental*

*Defense*, 509 F.3d at 561. We therefore remanded the 2006 Rule to the EPA "either to interpret CAA § 176(c)(1)(B)(iii) in harmony with (B)(i) and (B)(ii) or to explain why it need not do so." *Id*. at 562.

On remand the EPA acknowledged that it reads "any area" in subsection (B) to include local areas, and that therefore all three (B) requirements must be met in hot spot conformity determinations. Transportation Conformity Rule $PM_{2.5}$ and $PM_{10}$ Amendments, 75 Fed. Reg. 14,260, 14,276/1 (Mar. 24, 2010) (the "2010 Rule"). As amended by the 2010 Rule, the codified regulation now states that, to conform to an SIP, a transportation project:

> must not cause or contribute to any new localized CO, $PM_{10}$, and/or $PM_{2.5}$ violations, increase the frequency or severity of any existing CO, $PM_{10}$, and/or $PM_{2.5}$ violations, *or delay timely attainment of any NAAQS or any required interim emission reductions or other milestones* in CO, $PM_{10}$, and $PM_{2.5}$ nonattainment and maintenance areas . . . . This criterion is satisfied . . . if it is demonstrated that . . . no new local violations will be created and the severity or number of existing violations will not be increased as a result of the project, *and the project has been included in a regional emissions analysis that meets applicable §§ 93.118 and/or 93.119 requirements*.

*Id*. at 14,285/2 (codified at 40 C.F.R. § 93.116(a)) (with emphasis for text added by 2010 Rule). It is apparent that although the 2010 Rule modifies the passage to add a reference to delay in the first sentence, it does nothing to change the omission of delay from the next sentence, "This criterion is satisfied if . . . ."

Three environmental organizations accordingly petition for review, arguing principally that the 2010 Rule still fails to embody (B)(iii)'s requirement that the project not "delay timely attainment of any standard or any required interim emission reductions or milestones in any area." In this argument they echo a concern we expressed in *Environmental Defense* that satisfaction of the (B)(i) and (B)(ii) criteria would not in every instance assure satisfaction of (B)(iii): "[A]n individual project's emissions could counterbalance mitigation measures already in place, thereby delaying attainment of emissions standards and violating the requirement of (B)(iii) without either increasing or decreasing emissions." 509 F.3d at 560.

We review the challenge to determine whether the EPA's response was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. See CAA § 307(d)(9)(A), 42 U.S.C. § 7607(d)(9)(A); see also 5 U.S.C. § 706. Challenges to the EPA's interpretation of the CAA are of course governed by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

\* \* \*

In addressing the EPA's alleged disregard of (B)(iii)'s mandate, we initially assume that that mandate requires only that the project in question not delay attainment, etc., *beyond the dates of such attainment in the absence of the project*. (Petitioners question that assumption, and we'll return to it in due course.) The EPA has now explained, see 75 Fed. Reg. at 14,278/2–3, that the "counterbalance" scenario we hypothesized in *Environmental Defense* would in fact not be allowed by the current version of 40 C.F.R. § 93.116(a). This is because, ever since adopting regulations in 1993 to implement the (B) criteria, the EPA has applied a so-called

"build/no-build test";[1] under that test, a "new violation" will be found for an area if that area "would otherwise not be in violation of the standard during the future period in question, if the project were not implemented." See 40 C.F.R. § 93.101 (definition for "*[c]ause or contribute to a new violation*"). Similarly, to "[i]ncrease the frequency or severity" of a violation means "to cause a location or region to exceed a standard more often or at a greater concentration than previously existed and/or would otherwise exist during the future period in question, if the project were not implemented." See *id.* (definition of "*[i]ncrease the frequency or severity*"). The build/no-build test is dynamic, comparing concentrations with and without the project, focusing on the location and the time period for which the proposed project's emissions are predicted to be most pronounced. See 2006 Rule, 75 Fed. Reg. at 14280/1–2; see also 58 Fed. Reg. 62,188, 62,212/2 (Nov. 24, 1993).

Thus, in a case where new emissions were predicted to (partially or fully) counterbalance previously scheduled mitigation measures—so as to delay attainment beyond the previously scheduled achievement date—the project would *not* conform because the project's emissions would result in either a new or aggravated violation relative to the initial emissions trajectory. Petitioners have failed to provide any hypothetical or actual example of a project that could delay attainment without causing a "new" or "more severe" violation under these definitions.

---

[1] Adoption of the 2006 Rule was necessary simply because the EPA had in the meantime added a pollutant to the list requiring hot spot analysis, namely $PM_{2.5}$, and revised the rule for $PM_{10}$. See *Environmental Defense*, 509 F.3d at 557.

Petitioners argue that the EPA's interpretation of subsection (B) violates the canon that a statute should be read to give effect to every one of its parts. Petitioners' Br. 34–35 (citing *American Federation of Government Employees v. FLRA*, 944 F.2d 922, 932 (D.C. Cir. 1991)). But the 2010 Rule *does* give effect to each of subsections (i), (ii), and (iii). Although its test is in form in two parts, those parts operate—as we've shown—to implement all of the three components. This in no way contradicts Congress's decision, which it made, obviously, without foreknowledge that the EPA would write the implementing regulations in a way that would kill all three birds (all subsections of section (B)) with two stones.

Petitioners further advocate a startling interpretation of "delay timely attainment" as used in (B)(iii). According to them, it requires "existing NAAQS violations to be *eliminated* by the [attainment] deadline as a condition for project approval." Petitioners' Br. 29 (emphasis added); see also *id.* at 17. In other words, in a region that is already expected not to meet an upcoming attainment deadline, a new local project could not be approved unless it would *accelerate* the reduction of emissions enough to ensure timely compliance, even if the project would not delay attainment a millisecond beyond its formerly expected date.

The EPA's 2010 Rule obviously embodied a quite different notion—that a new project delays attainment only if its implementation *postpones* attainment beyond the date by which it would have been achieved without the project. See Respondent's Br. 41. As the EPA points out, "In Petitioners' view, even if a new transportation project in the build scenario *improves* air quality, if it does not achieve enough reductions to offset all other sources that cause violations, the project could not proceed." *Id.* at 40 (emphasis added). But for any such extraordinary blockage of harmless development, one would expect Congress to be most emphatic and clear.

"Congress . . . does not . . . hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

The statutory language being of little use to them, petitioners turn to a snippet of legislative history and an excerpt from the EPA's original 1993 regulations. The snippet of legislative history in fact supports the EPA's position and requires no discussion at all. The passage from the 1993 regulations, 58 Fed. Reg. at 62,191/1–2, expressly turns on a different subsection of CAA § 176(c), namely § 176(c)(3)(A)(iii), and only as applied to ozone and carbon monoxide nonattainment areas. See also 58 Fed. Reg. at 62,197/1.

Thus we find that the 2010 Rule does give effect to (B)(iii), and that the EPA's interpretation of that provision—that "delay" is evaluated relative to what would otherwise have occurred—is entirely reasonable.

\* \* \*

Insofar as petitioners allege in their reply brief deficiencies in how hot spot analyses measure new or expanded projects' contributions to background emissions, their objections are forfeit and, in any event, outside the scope of our remand to the EPA. Our remand in *Environmental Defense* focused on EPA's apparently inconsistent treatment of CAA § 176(c)(1)(B)(i), (B)(ii), and (B)(iii), and does not provide petitioners with the opportunity to challenge aspects of conformity analysis not integral to the remand or the EPA's action in response. Cf. *Natural Resources Defense Council, Inc. v. EPA*, 638 F.3d 1183, 1190 (9th Cir. 2011) (placement of air quality monitors relative to highways was subject of prior rulemaking and could not be challenged in the instant action).

Petitioners additionally take issue with the 2010 Rule's new requirement that local projects must be "included in a regional emissions analysis that meets applicable §§ 93.118 and/or 93.119 requirements." See 75 Fed. Reg. at 14,285/2 (codified at 40 C.F.R. § 93.116(a)). They argue that the EPA admits that "SIP [regional-level] modeling is unlikely to identify all locations that warrant a hot-spot analysis," see Petitioners' Br. 37 (quoting 75 Fed. Reg. at 14,278/1), that hot spot analyses are statutorily and functionally distinct from SIPs, see *id*. at 36–40, and that therefore the incorporation of regional analysis into the 2010 Rule is "not a permissible substitute for preventing localized NAAQS violations," *id*. at 36.

The difficulty with petitioners' argument is that no one ever seems to have supposed that SIP regional analysis could "substitute" for local conformity evaluations. The EPA naturally responds that the regional requirement is "necessary, but not sufficient, to satisfying the hot-spot requirement." Respondent's Br. 38. The addition of the regional component to the test merely clarifies that in order to conform, transportation projects must comply with other (preexisting) statutory and regulatory regional-level requirements.

\* \* \*

In sum, given the EPA's clarification that (B)(iii) applies to local projects and its persuasive explanation of how the substance of the "delay" condition is met, we are satisfied that the 2010 Rule is not arbitrary, capricious, or inconsistent with law for the reasons raised in *Environmental Defense*. In particular, it is now clear that a project giving rise to the "counterbalance" hypothetical we described in that case would not be deemed conforming.

The petition is therefore

*Denied.*